LOGAN VALLEY BANK, APPELLEE, v. MARTIN CHRISTENSEN ET AL., APPELLANTS.

FILED MARCH 13, 1915.   No. 17978.

1. **Parol Evidence: DEEDS: CONSIDERATION.** The true consideration for a deed of conveyance of real estate may be shown by parol evidence, although the deed recites a consideration.

2. **Appeal in Equity: TRIAL DE NOVO.** Upon appeal to this court, an equity cause is tried *de novo*, without reference to the decision in the district court; but, when the trial court has evidently relied upon the testimony of a witness examined before him orally, this court will regard that fact in weighing the testimony of such witness.

3. **Contracts: CONSIDERATION: SUFFICIENCY OF EVIDENCE.** The evidence indicated in the opinion is found sufficient to support the findings and decree of the trial court.

APPEAL from the district court for Dodge county: CONRAD HOLLENBECK, JUDGE. *Affirmed.*

*Baldrige, Keller & Keller,* for appellants.

*C. E. Abbott,* contra.

HAMER, J.

Martin Christensen, appellee, carried on a general merchandise business at Uehling, in Dodge county, Nebraska, prior to September 5, 1911. About that time he had difficulty in realizing money out of his assets. Freeman P.

98Neb.4

Kirkendall & Company of Omaha were his principal creditors. Christensen's stock and fixtures invoiced between $8,000 and $9,000, and he had accounts and bills receivable amounting to about $1,800. He also had his store building and lot in Uehling (lot 15, in block 9). He also had a dwelling-house and two lots, being lots 6 and 7, in block 18, Uehling, and worth about $1,700. This dwelling-house and the lots on which the same was situate constituted his homestead. Christensen borrowed sums of money from the plaintiff, the Logan Valley Bank, and paid the same to merchandise creditors. He owed the bank $2,000. Christensen's total indebtedness was about $10,000, of which the sum of $8,000 was due to his commercial creditors. The sum of $2,000 due to the Logan Valley Bank was secured by a real estate mortgage on the homestead and store building. Christensen met the appellant Kirkendall in Omaha and talked over the facts with him. On September 5 they together agreed orally that Kirkendall would take over Christensen's business, his stock, fixtures, bills, and accounts receivable, and also his business real estate. Kirkendall was to discharge Christensen's wholesale obligations. A bill of sale of Christensen's personal property to Kirkendall as trustee was drawn up that day and signed, witnessed and acknowledged in Douglas county. A mercantile adjuster named Pearson went up to Uehling to invoice the stock. The stock was invoiced and the bills and accounts receivable were examined. A deed was executed by Christensen and his wife to Freeman P. Kirkendall as grantee. Kirkendall took over the stock, the fixtures, the bills, and accounts receivable, and the business real estate. In the bill of sale the consideration named is "one dollar and other valuable consideration." The only instruments executed seem to have been the bill of sale and the deed. There was no written agreement nor any written evidence of what constituted the "other valuable consideration."

The bank commenced foreclosure proceedings on its mortgage. Mr. Christensen and wife and Mr. Kirkendall were made parties defendant. Mr. Christensen answered

and alleged that, in consideration of the transfer of the property to Kirkendall, Mr. Kirkendall agreed to pay the bank's mortgage of $2,000. This Mr. Kirkendall denied. The court found the issues in favor of Mr. and Mrs. Christensen. The decree in the foreclosure suit, after finding the amount due upon the bank's mortgage, provided: "It is further considered, ordered, and decreed that lot 15, in block 9, of the village of Uehling, Nebraska, aforesaid, be first sold by said sheriff, and that if the same be sufficient to pay the amount aforesaid, with interest and costs, that lots 6 and 7, in block 18, aforesaid, be not sold; and that if the money arising from the sale of lot 15, block 9, aforesaid, shall be insufficient to pay the amount due to the plaintiff, with interest and costs, that lots 6 and 7, block 18, aforesaid, be sold, that upon the confirmation of such sale the defendant Martin Christensen will be entitled to apply to the court for an order and judgment that the defendant Freeman P. Kirkendall shall pay to the said defendant Martin Christensen the amount of such deficiency so satisfied out of lots 6 and 7, in block 18, the homestead of the said Martin Christensen and Magrehte Christensen, together with interest thereon from date of such report."

It appears to have been stipulated at the commencement of the trial that Kirkendall agreed to pay the mercantile creditors. Whether he also agreed to pay the secured claims to the bank was by stipulation left open for proof. At the trial Mr. Kirkendall did not appear and did not testify. Christensen testified that he voluntarily went down to Omaha; that Kirkendall, after hearing a full statement of the facts, agreed to pay all of Christensen's indebtedness; that he agreed to turn over to Kirkendall all of his property; that he explained to Kirkendall how much he owed the bank and how much he owed the building and loan association on the store building. He said that he had a slip of everything, and that everything was laid before the creditors; that Kirkendall agreed to pay everything. Christensen ran the store three months for Kirkendall for $50 a month. He testified that he was

to get all his debts paid; that Kirkendall was to pay the indebtedness to the Logan Valley Bank.

Christensen is positive in his evidence that Kirkendall said he would settle with all the creditors; that he also said that he would pay the $2,000 mortgage. He also testified that Kirkendall and himself made out the "whole thing," meaning the arrangement; that the $2,000 debt owing to the bank had not all been incurred at one time; that he got the money from the bank, and that he paid it to the parties from whom he got the stock of merchandise; that this whole $2,000 was "merchandise debt;" that Kirkendall sent Pearson up to Uehling to take over the property and get the deed.

Pearson testified that the agreement was made between Christensen and Kirkendall before he (Pearson) went up to Uehling, and that he closed up the deal between them when he went up there. Pearson said that he had been given instructions by Kirkendall as to what the agreement was: "Q. You were to go up there and take it over? A. Yes, sir. * * * Q. And you had instructions from Mr. Kirkendall, at the time you went up there, that in taking it over to take an invoice? A. To take an invoice; yes, sir. Q. And report that invoice to him? You stated that your business at that time was that of mercantile adjustments. You mean by that, do you, that you go out for wholesale houses and take over stocks for creditors; that's your business? A. Yes, sir. Q. And then, in line with that, you exercise extreme care to get all that is coming to the creditors? A. I try to."

Christensen told Pearson at Uehling, when Pearson came up, that the agreement with Kirkendall was that Kirkendall was to pay the mortgage. When Pearson prepared the deed, Christensen wanted it fixed so that Kirkendall would be required to pay the mortgage. Christensen testified: "Q. And did you have some difficulty with him (Pearson) as to how the deed was to be drawn? A. Yes, sir; I had a conversation about it, I asked him—I had seen one subject to a mortgage for so much, and I thought that that would be sufficient—and I asked Mr. Pearson if

that was sufficient, that they would sure pay the $2,000; and he said, 'yes.' "

On the other side, it is contended in the briefs of appellants that "it is inconceivable that Mr. Kirkendall would agree to pay all of Christensen's debts, regardless of what they might have been, having only Christensen's word that they amounted to $8,473. Yet Christensen said that the deal was made between himself and Mr. Kirkendall, and claims that Mr. Kirkendall then agreed to pay all his debts."

It is also said in the brief of appellants: "It is inconceivable that Mr. Kirkendall—who is not in the real estate business—would agree to pay a $2,000 mortgage on property that was not worth to exceed $2,000, and that Christensen did not claim was worth more than $2,000, and that, too, without ever having seen the property or learned anything of its value, except from the mere statement of Christensen. Yet Christensen says: 'Q. Mr. Christensen, when was it that you had this conversation with Mr. Kirkendall, in which he said that he would take care of the $2,000 mortgage? Was that the first time you were in Omaha? A. First time I was there; yes, sir.' "

On the trial of the case it was admitted, through Mr. Kirkendall's counsel, that he did what counsel argued was incredible. It was stipulated in open court on the commencement of the trial: "That on September 5, 1911, Kirkendall received said property in full satisfaction of all indebtedness of said Martin Christensen to the creditors scheduled and receipted in exhibit A in defendant Kirkendall's cross-petition filed in this action, and that said Kirkendall agreed that he would discharge all of said indebtedness against Martin Christensen to said creditors as recited, and stated in exhibit A attached to said Kirkendall's cross-petition filed herein." It was also stipulated: "This stipulation is without prejudice to the right or rights of said Martin Christensen and Magrehte Christensen, the defendants, to prove by the evidence that said Kirkendall agreed, as part of the consideration for said deed and bill of sale and transfer so made to him, that he

would pay to said bank said mortgage debt and interest, and discharge the indebtedness of said Martin Christensen and Magrehte Christensen to said bank." Kirkendall appears to have admitted that his obligation was to pay the other creditors. By this admission the stipulation narrowed down to whether he also agreed to pay the bank. The thing, therefore, which appellants argued to be unreasonable was the very thing which they stipulated. It might be said that Kirkendall needed the store building to do business in. It was also possible that he might have a surplus after paying the bank. While it was not especially important to Christensen that his wholesale merchandise bills should be paid in full, except perhaps his desire to be fair and to have his liabilities cleaned up, yet it was important to him that the mortgage which covered his homestead should be paid. This mortgage on the homestead was incurred in business. Because of that fact it was proper to consider that it should be satisfied if the parties so agreed.

The following question and answer relate to the conversation which Pearson had with Christensen up at Uehling: "Q. What, if anything, was said about the indebtedness to the Logan Valley Bank, the corporation plaintiff in this action (referring to his conversation with Mr. Kirkendall in regard to this transaction)? A. That was stated in the mortgage, that it was subject to $2,000, when the property was turned over to him."

At the time Kirkendall bargained for and took a deed to the store building and lot, it may have been worth enough to pay the mortgage to the bank. The apparent object of Kirkendall is claimed by the appellee to be to use it in connection with handling the stock and for what profit there might be in buying and selling it. Pearson seems to have estimated the excess over the amount required to pay the mortgage to amount to $200 or $300. Of course, the principal concern of Mr. and Mrs. Christensen was to have the mortgage debt paid when it fell due and to protect the homestead.

Counsel for Kirkendall make an argument that, because the bank did not hear any conversation between Christensen and Pearson about the mortgage, and because Pearson says that Christensen did not have a conversation with him about Kirkendall paying the mortgage, therefore the probabilities were that there was no such conversation. Kuhlman testified that he did not hear the conversation between Christensen and Pearson, or pay any attention to it. Both Christensen and Pearson testified that there was a long conversation between them about the mortgage and the wording of the deed, both in the store building and also in the bank. Pearson testified directly: "There was at that time quite a conversation in reference to this mortgage." While Pearson disagrees with Christensen as to just what the conversation was, he fully admits the conversation. He also testified that part of the conversation was in the store and part of it was in the bank. Pearson testified: "Q. As you originally drew the deed you left out that clause subject to the mortgage; you put that in after you and he had the conversation? A. There were two deeds drawn, the one of them was worded that they did not like it, the wording in reference to this mortgage. The fact that I had placed in the deed where the mortgage notation was, it was a blanket mortgage, and I described two properties, while it was covering this one property, and then the banker and Mr. Christensen advised that we make the notation subject to the mortgage of $2,000, not designating the other property in the deed." It will be seen that the Christensens did everything that they could to have their agreement with Kirkendall carried out and the home property protected. The putting in of the wording "subject to the mortgage" was not by the advice of Mr. Kuhlman or Mr. Christensen. Pearson put it in himself. The facts and circumstances show that there was an agreement that Kirkendall should pay the mortgage. Pearson drew the deed and handled the wording of it. He said "subject to the mortgage" was enough, and that they were going to pay the mortgage out of the stock. Christensen testified: "I asked him if that was

sufficient to put in, 'subject to the mortgage for $2,000?' Q. You asked him what? A. I asked him if that would cover it, and he said it would, that that was understood that it was to come out of the stock that he was to pay the bank with. Q. What did he say about paying the bank? A. He said they would pay the bank. Q. You asked him whether the recital in the deed or papers was sufficient to show that they would be compelled to pay that money to the bank? A. Yes, sir. Q. And he said that it was? A. Yes, sir. Q. Who said that? A. Mr. Pearson."

Pearson seems to be mistaken about some of the details of the transaction. He testified to drawing the bill of sale in Uehling after the taking of the invoice. It appears to have been drawn in Omaha and to have been acknowledged there.

The case of *Lexington Bank v. Salling*, 66 Neb. 180, lays down the rule: "The conveyance of land subject to an outstanding incumbrance imposes upon the purchaser no personal obligation to pay such incumbrance." That is undoubtedly true, but the case does not seem to be in point. The question was not in that case whether the consideration could be shown by parol testimony. *Mowry v. Mowry*, 137 Mich. 277; *Herrin v. Abbe*, 55 Fla. 769, 18 L. R. A. n. s. 907; *Magill Lumber Co. v. Lane-White Lumber Co.*, 90 Ark. 426; *Langan v. Iverson*, 78 Minn. 299; *Wiltrout v. Showers*, 82 Neb. 777; 17 Cyc. 653.

"The true consideration for a deed of conveyance of real estate may be shown by parol evidence, although the deed recites a consideration." *Goodman v. Smith*, 94 Neb. 227.

The reason for the rule last above stated is that a change in or contradiction of the express consideration does not in any manner affect the covenants of the grantor or grantee, and neither enlarges nor limits the grant. The real question to be determined is: "What was the actual consideration?" In the instant case there is no written evidence of what the consideration for the deed actually was. It must be proved by parol, or not at all. The language of the deed in reference to the consideration is "and other

valuable consideration." This necessitates oral evidence of what the consideration actually was.

There can be no marshaling of assets as against a homestead. *Mitchelson v. Smith,* 28 Neb. 583; *Cooper Wagon & Buggy Co. v. Irvin,* 83 Neb. 832.

We do not think that the appellants should be permitted to take the homestead of the Christensens away from them. This case was tried before the judge of the district court, Conrad Hollenbeck, who heard the evidence himself without referring the case to a referee. He saw the witnesses and heard them testify. He believed the evidence of Christensen, and we cannot say under the circumstances that he was wrong in so doing.

The judgment of the district court is sustained by the evidence, and it appears to be right, and it is

AFFIRMED.

MORRISSEY, C. J., BARNES and LETTON, JJ., not sitting.